Let's wait a minute and let everyone get settled. I'm sorry, Your Honor? Let's wait a minute and let everyone get settled. Oh, all right. Yes. Hello, Mr. Wade. Welcome. I haven't seen you in a while. So, this is a question I sometimes ask, like our AUSAs and people who have been around here for a long time. Do you have any idea how many Fifth Circuit arguments you've made? A whole bunch of them, Your Honor, and it's usually Jim White or Pellox. So, it's a whole bunch of them. You've got a lot of blue paper in your class. Yes, a bunch of them. All right. Okay, Mr. Wade. Your Honor, may it please the Court, this case is here on a motion for summary judgment. The reason summary judgment should never have been granted in this case is that it's all about the facts and intent. It has almost nothing to do with the law. It's all about what was the intent of Ms. Rich, the co-worker of Mr. Pulliam. There's some conflict in the testimony they gave you. Was it about intent or was it about the reason your client was fired? It's about both. I think those are both factual issues. Yes, those are two. That's another factual issue, Your Honor. That's why I was fired. And I might say the conflict is Principal Bush made it clear and what he understood from Ms. Rich was that the real complaint of the major thing was the racial component, whereas the superintendent had a different story and she said it's a combination of both. Well, who asked her to fire me? That's another issue of material facts, Your Honor. Well, just answer my question. Who asked her to fire me? It's an issue of material facts. I can't answer your question, Your Honor. It's an issue of material facts because they said two different things. They said two different things. I'll strike that. The law states, the statute states, that the superintendent has firing authority. But Principal Bush said they all conferred together. Bush, the superintendent, and primarily according to the superintendent, the law. So the record's not clear about who made the decision. I'd say the best rating of the record is that all three did and probably primarily the lawyer made the decision. But you can read that and get conflicted versions about it. So you need a trial to figure out who actually discharged or caused your client to resign. Your Honor, I don't really know, deciding which one of them did it. I would say this. The jury could find that the racial component was really, the jury could find that from Principal Bush's testimony. So the jury could find that it was the racial component. And those other things were just fictitious and thrown in to try to make it appear that he was a racist when they knew he wasn't a racist. Now, let me talk about that, Your Honor, because I really think that's the heart of the case. Well, I'm sure you do, and I'm real clear, and I've had you in front of me a lot of times, too, on the Blue Brief. And I understand the heart of it is you want to get to a jury. Absolutely. That's not lost on me at all. And so it's an argument about what the jury could hear. But, you know, I read the brief. We all read the briefs. So, you know, just so you know, you started your argument by saying this case is about the intent. That made my ears perk up, because to me that's not the way I read it. But it's your argument, you make it. Well, Your Honor, let me start out by saying this. You can read the record, and the jury could reasonably draw or could infer that this was all about race, that that was the reason. And these other things didn't have anything to do with it. It was about race. Start out with a background. If you want to pick somebody that is least likely to be racist, it would be Mr. Pruitt. Counsel, did your client ever deny using the racial epithet that was alleged? No, ma'am. Exactly what he did say, Your Honor, was it was used in a fashion to demonstrate non-racism. He never said anything that was intended to be a racial slur. To the contrary, he's trying to demonstrate this lady, who apparently has a strong belief that a lot of white people are racist. I'm not saying that's right or wrong, but that's what she believes. There's evidence in the record to demonstrate that. Such as her Facebook postings. But he's trying to convince this lady, who apparently is convinced that he's racist, that he's not racist. They had an earlier conversation, you know, about where he declined to answer about who he voted for. And she puts his Facebook post up saying that white silence is white condoning violence, or words with that effect. So she has a tendency to believe there's a lot of racism in the world. And he's trying to convince her that he's not a racist. How does her belief matter if he admits that he used the word? Well, because, Your Honor, a jury could reasonably find that he didn't use a racist term under the circumstances of this case. In probably every other scenario I could imagine, the term N-word would be a racist word. However, if it's just the opposite. We got a young man here. He went into segregation days like I was, Your Honor. He doesn't even know about that. He's 25 years old. But he goes to public schools, which in Mississippi now are almost totally segregated. Only the black people go there for the most part. But in the sports, it's overwhelmingly black. The basketball team, the football team, very few white players on those teams. He's one of the few white players on those teams. And he said, and they have it contradicted, that those were his brothers. And that there's an understanding between him. He's not my age, Your Honor, but he's 25 years old. And his understanding is he's their brother. And when they tell him that we like him so much, that you're our brother, you're one of us, that just like we call each other the N-word. And I know that personally. They do that. I've been to basketball games with them when I was young. They do that personally, use the N-word toward each other. And they tell him, you are so friendly with us and such a friendship with us, that you can use the N-word. And he's merely relating to our conversation. It's just as innocent as when the opposing lawyer uses the N-word, and she actually uses it in the briefs. It's not done for the purpose of showing racism. It's done for a non-racist purpose. And so it's up to her. It's not a legal question. We didn't study that in law school, Your Honor. This is a question of common sense and facts for the jury as to whether she knew at the time that he was not using this with any racist intent. Perhaps he was taking her to lunch. That's what he was doing. He was taking her to lunch. Does the purpose he used it matter if he admits that he used it? Absolutely, Your Honor. The whole question is whether she intentionally, it doesn't matter whether she intentionally caused the district to discriminate against him because of racism. Was her purpose grounded in race, in racial considerations? No, no. I'm not talking about her purpose. I'm talking about his purpose. Does his purpose in using the word matter? Isn't the important thing here the fact that he used this term? No, no. The important thing is whether the jury would believe that he used, not whether the court or whether Your Honor believes he used it in a racist fashion, but whether the jury would believe and whether she knew at the time that he was not using it in a racist manner, but she had a racist attitude toward it. She believed, and this is for the jury to decide whether it's true or not, she believed that any time, like Your Honor is saying, which maybe Your Honor believes is, any time you use the word, then it's got to be racist, even though the black people are using the word and telling him that he can use the word to demonstrate how close we are and what our friendship is. That's a fact question for the jury. It's not a legal question. But the court can say all the ways and under every circumstance that he used the N-word as racist. Judge Stewart, we had a case talking about our old case that we had together where it was a vest case and you were on the panel, and Your Honor may somehow have a way of honoring him. Mr. Wade, I'm trying to restrain myself in the face of what you are arguing, so I really am. This is, you know, I'm trying to restrain myself in the face of what you are arguing. All right. This proxy for being able to use the N-word. Just say, just know it's not working on me. So argue something else. No, thank you, Your Honor. Well, let me ask this. Did your client concede that he did bring tobacco products on the school grounds into this classroom that they shared and put it in Ms. Ridge's desk? Yes, ma'am, under a totally different circumstance. What he said in his deposition is, and by the way, the jury could find that tobacco business had nothing to do with it because they didn't complain about it at the time. That's another evidence of pretext. She didn't complain about it. But what he said was that he asked her permission to go out to the truck and get his dip, and would this bother her? And she said, no, it's okay with me. That's what his version of it was. He didn't do it until she got his permission. And then somebody came in the office and saw it, and he hid it and started to put it in her desk. And when that happened, she said, no, don't do that. And then he did do it. But she never expressed any objection to it. That's part of the reason we say that it's pretext, John, is because she's so upset about the tobacco. And she said her deposition two different ways, but she finally ended up saying it was the tobacco. It wasn't the use of the N-word. The thing that pushed me over that got him fired was the use of the tobacco. That offended me because they could have fired me for it. Was bringing tobacco onto school grounds a violation of their ethics code or not? Yes, ma'am, it was. So he committed a violation. Okay, so he admitted the violation. So if your Honor interprets it that way, well, you're right. It is a violation to bring tobacco onto grounds. But also, there can be legitimate and non-legitimate ways. If he admitted, if your Honor were reading the record correctly instead of allowing the jury to decide the facts, if your Honor does that and say that he admitted everything, he could still have a—she could still have a racial motivation in trying to mislead the board as to what happened. And the explanation—let me give you another example. Coach Cathy, she didn't report any of these things until after the race incident. But the Coach Cathy thing, when she says he talked negatively about Coach Cathy, he said, I had just gotten on campus. He was hired either late July or early August. This conversation happened on August 2nd. I didn't even know Coach Cathy well enough to say anything negative about Coach Cathy. But she said negative things about Coach Cathy. She said Coach Cathy was, quote, fucking lazy and the kids hated it. That she said that. So there's evidence in the record that the court can— the jury gets to decide who to believe. In America, the jury is supposed to get to decide who to believe. And so the jury could decide that the whole thing— well, we've all heard the most effective lie is one that has kennels of truth in it. The most effective lie. It certainly has—what she said certainly has kennels of truth in it in the sense that, yes, he did bring tobacco in, and, yes, he did the N-word, but there's another side of that. The other side of it is that the jury could find that she knew at the time that he was not racist. She should have known that because of his background. And the statement that the black players that I play with and my brothers told me— not me, it wasn't my idea, it was their idea— they told me that we're so close that we can use the N-word. So what the defense is really doing, Your Honor, is defeating the white people, the few white people, that try to treat the racists equally, even, that treat blacks just as though they were his brothers. Those are the people in North Mississippi, the few people that can go to the public schools. And you're saying that's what this case is about? I'm saying this case is a great injustice to take somebody who's trying, doing everything to promote non-racism, Your Honor, doing everything to demonstrate what a friend he is with black teammates, and then— But your client was terminated for violations that he acknowledged, that he admitted to, Mr. Wade. I mean, Judge Ramirez has asked you that. You haven't said that he didn't admit to those? Well, Your Honor, the violation that he admitted to was bringing the tobacco into the school. Everything that he said was done with an innocent purpose. You know, for example— Do you say there's a genuine issue of material fact with respect to whether or not there were three violations of the Mississippi Code that he was found to have violated? Do you say there's a fact issue? This is trivial, but it's not the Mississippi Code we're talking about. Well, whatever, the governing Mississippi law. That's a trivial law. Your Honor, there were two different stories by the defendants as to why they terminated. One was the superintendent said three violations in her deposition. She wasn't familiar with the Cathy incident, and she said, well, maybe there were only two violations. And then the question was asked, where was your fine for those two? And she said, I don't know. I'd have to consult my lawyer. On the other hand, the principal said the whole thing was racial. When she told me about it, I interpreted it to mean she's upset because of the use of the N-word. As they say in there, using a racial slur. That's the record of excerpts page 10-5, reason C. The principal said that is the reason. These other things, we would give them a warning about it. They didn't amount to anything. And as I say, there's a conflict. At least when you read the records, you can't be clear about who exactly made the decision. But my best reading is they all did. And the most likely person is the lawyer whose deposition wasn't taken. It would be Attorney Clyde Cricket. But regardless of whoever made the decision, a jury could reasonably find it was a decision at least partially based on race. You say, well, he admitted the tobacco use. He never admitted the crucial thing about race. He never admitted that the use of the N-word was for any purpose other than anti-racist. What I'm saying is a jury could find it. I'm not asking your court to find anything. But I'm asking that a jury could find that this young man was non-racist. That his whole short life has been devoted to non-racism. And for us to have a black man also, a jury could infer that not only white people but also black people can be racist. And when she makes a statement like it was wrong, and this is in the record, it was wrong for him to try to befriend me, a jury could infer that what she meant by that was because he's white. A jury could infer it's a strange statement to make when she says it's wrong for him to try to befriend me. And when she knows that he's out in the process of taking her to lunch, and when she makes the statement that it's, I don't think white folks should ever use that term, no matter what, referring to white folks. And so she's differentiating between whites and blacks. She's written an email where we know she's very race conscious. And all we have to show, Your Honor, all the jury has to find is that race was one motivating factor, not that it was, you know, not that it was the only reason. All right. You've saved time for rebuttal, Mr. Price. Thank you. Thank you. Good morning. May it please the court. I'm Mackenzie Price. I'm the appellee of the Benton County School District and Jada Ridge in this Title VII race discrimination and breach of contract case. And as counsel opposite began with the phrase that this is a case about intent, it is common saying that certain roads are paved with good intentions, but the law in this case certainly is not. At bottom, what the appellant is attempting to argue is that under the cat's paw theory, that somehow the discriminatory motive that he cannot establish on behalf of a co-worker, whose influence he cannot establish, somehow led to his forced resignation. However, the cat's paw theory is a theory of causation. We are talking about causation here. And it is well established at this point that under the cat's paw theory, motive is not what is imputed. It is the actions. Here, what all that Mr. Fulham is trying to do is impute what he claims to have been discriminatory motive to the employer. Now, it has never been disputed in this entire case that the ultimate decision maker was the superintendent, who her behavior, her conduct is ultimately approved by the board. Here, the board approved Mr. Fulham's resignation. There's no dispute about who the decision maker was. What Mr. Fulham has been arguing is that his co-worker harbored some discriminatory animus against him, and that even though the report she made was truthful, and even though he admitted to three of the five contents within that report, that somehow her discriminatory motive should skip over the actions, skip over the admissions, and leap onto the back of his employer. That is not what the cat's paw theory was meant to do. That is not how it was defined in the Stove case, nor in the groundbreaking Shaker case where it was first coined. This entire theory is a theory of causation. He has to show that this person with discriminatory animus actually used the decision maker as a rubber stamp to bring about the intended consequences. Mr. Fulham's case fails at every single step and angle of the theory he himself is alleging because it is well established by this court in the Amin 2007 case, the Laxton 2003 case, the Wallace 2001 case, if a plaintiff admits to the misconduct that ultimately caused the termination, the cat's paw theory goes out the window. The influence is cut off because this is a theory of causation. All that is imputed is the action, not the motive. When a plaintiff admits to the misconduct, the causal chain is broken. When the causal chain is broken, the cat's paw theory has never, and no court has actually said that the motive carries over regardless. In fact, in the Stove case, repeatedly the court commented on how this is a theory of causation not one of imputing motive. It recognized that in agency principles that the malicious mental state of an earlier agent cannot be combined with the allegedly bad act of a later agent in order to impute liability on the employer. Here, Mr. Fulham admitted to all three violations that led to his resignation. His admissions break any potential causal chain between his co-worker's report, which he admits was truthful, whether or not she reported him for some other subjective discriminatory motive, that motive is not imputed. His admissions break any causal chain that could have existed. And even still, Dr. Biggers testified unequivocally, quote, ultimately because of those three admissions by Mr. Fulham himself, that is why he was fired. Pamela Gray, the assistant superintendent, confirmed it was a combination of the admitted violations that led to Mr. Fulham's forced resignation. So too did Mr. Bush. Now, there's not enough time for me to go through the record and realign and readdress some of the testimony, but Mr. Bush unequivocally testified repeatedly that it was the combination considered in totality of the admitted violations. Full stop. It's the admissions that led to Mr. Fulham's resignation. Nothing more. And even if we take all that out of the picture, he still fails on the cat's paw theory because he can't show that Jada Rich intended that he be terminated. At best, her complaint said, I don't want to share a classroom with him because he might get me fired. That is what's in the record. Now, in the appellant's reply brief, he disputes that it is relevant whether the original actor intended a lesser sanction. However, this court has explicitly rejected that precise argument. And I believe it is the Laxton case. This court has already held that the intended adverse action is what matters, not a lesser intent resulting in termination. In the Laxton case, the intent was transfer. That did not qualify for cat's paw causation theory to apply when the plaintiff was terminated. So the ultimate action is not met. The entire causal chain has been broken. There is no grounds to apply the cat's paw theory. And even still, because of all these reasons with the issues with the causal chain, the fact that motive is not imputed, Mr. Bloom cannot show that Jada Rich exerted any type of influence or leverage over the decision maker. As this court has held repeatedly, there is no influence when the plaintiff himself admits to the misconduct. Additionally, he still cannot make the two foremost showings in order to even invoke the cat's paw theory. He cannot show that Jada Rich exhibited discriminatory animus based on race. All of the matters that he attempts to point to to show some animus and prejudice have been fully addressed in the briefing. However, I would like to note as to his arguments on the Facebook post, for instance. The version of the post that is in the record is cropped. You can only see about what appears to be 20% of a post sharing a public news article about a matter of public concern. A man who was arrested for assault charges where this man, I believe from some of the deposition testimony by Mr. Bloom, had essentially purposely run over a black teenager. At best, the post that is in the record is cropped entirely. It does not even show Jada Rich's name other than in the search bar. But the post that he alleges she made saying white silence condones white violence, that is not discriminatory animus. While this court has not ever defined animus, Webster's Dictionary has. Animus is a hostility. It is ill-will animus. That is not at all what is represented in that post. Even still, that post was made before Ms. Rich ever met Mr. Bloom. The post in the record was made July 27th. These two individual co-workers met on August 2nd. Now, just as with the, quote, Trump is racist statement, this Facebook post has positively no ability nor bearing on whether Jada Rich exhibited discriminatory intent because as this court has recognized in the Ray vs. UPS case, the Russell vs. McKinney Hospital case, what matters when you're pointing to comments of a co-worker or supervisor to show some exhibited discriminatory animus is the CSI logics test. There are four factors there and Mr. Fulham cannot meet any of them. As we explained in our brief, even assuming any of these statements showed any sort of animus, at most they would be stray remarks because they are not related to Mr. Fulham at all. In fact, the Facebook post was before the two even met. These comments have no bearing whatsoever and do not show any form of discriminatory animus. Now, as to the other issues, today and in his briefing, while he is attempting, Mr. Fulham is attempting to show that Ms. Rich exhibited some discriminatory animus, he relies almost exclusively on his use of the N-word, completely ignoring the fact that he admitted not one, not two, but three violations of Mississippi Educators' Code of Ethics. He wants to throw the other two completely out of the window, ignore the fact that the entire record exclusively demonstrates that the two of the five ultimate reported allegations that Mr. Fulham denied were never considered. Only the ones that Mr. Fulham admitted were ever considered in anything in this case. He wants to ignore all that and make this all about Mr. Fulham, a white man, using the N-word in conversation to a co-worker during a school-related activity. Now, the bottom line of Mr. Fulham's argument, as I understand it, is that Ms. Rich, in her report, claimed that he used the N-word as a slur and that that is how she made a misrepresentation by qualifying the word as a slur because, in Mr. Fulham's opinion, he used it in a non-offensive, non-discriminatory, racially neutral way. This court has explicitly rejected that argument. In fact, pretty much every circuit across the country has rejected such an argument that the N-word is fine. It is not. The law tells us it is not. This is not a case about intent. This is a case about black-letter law. And the black-letter law says, It is beyond a question that the use of the N-word is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination. The N-word is perhaps the most offensive and inflammatory racial slur in the English language. That is from the Vest v. MTV Consumer Group case, where the plaintiff made an almost identical argument to that presented by Mr. Fulham, and that argument failed then just as it does now. Because the N-word is a racial slur. Mr. Fulham cannot intend away the meaning, the etymology, the history, significance, and semantics of a word. He cannot intend away the discriminatory and offensive meaning of a word. Words have meaning. A racial slur is a slur inherent to the use of the word. It does not matter that he now, after the fact, says, But I didn't intend it that way. The N-word, whether pronounced with an A or an R, only has racial connotations of a derogatory nature. It is not defined by Merriam-Webster Dictionary as a perfectly acceptable word to refer to friendship. It is defined by Merriam-Webster as an offensive racial slur. And, in fact, out of all these arguments, Mr. Fulham focuses almost solely on saying the N-word was not offensive. Yet here today, Mr. Fulham's counsel cannot bring himself to utter the very word he seeks to justify. He wants to point out that it was used in depositions or in briefs, and yet Mr. Fulham's counsel cannot utter the very word he seeks to justify. The silence speaks volumes. In this case, Judge Mills undoubtedly got this completely right when he granted the Benton County School District and Jader Ridge summary judgment. There are no disputes of material fact. The appellees are entitled to judgment as a matter of black-letter law. For all of these reasons, the reasons in our briefs, because of the fact that this case comes down to admitted three violations of Mississippi Educators' Code of Ethics by Mr. Fulham, the sole result that is proper under the undisputed facts and binding law is that neither Jader Ridge nor the school district is liable for Mr. Fulham's resignation. The appellees merely ask that this court follow clear black-letter law, just as the district court did, and apply that law to the undisputed facts of this case. Mr. Fulham, on the other hand, is seeking to have this court stretch the cat's paw theory of causation to unprecedented proportions in a matter that directly conflicts with long-standing precedent. Mr. Fulham wants this court to stretch the cat's paw back long past its actual reach in order to have this court take his co-workers' allegedly racially discriminatory animus, which he cannot show, for reporting three truthful violations, which he admitted, and stretch that cat's paw so far that this alleged motive can be imputed to his employer to create liability where none exists. The cat's paw is about causation. There is no causation. He can't. Mr. Fulham, can I just say? Ms. Price, you're repeating yourself. Thank you. Some of the things that you've said, you've said three or four times. If y'all have any questions, I feel like I am just— We only need to hear it once. If you have anything additional that you haven't imparted, now's the time to do that. Well, Your Honor, if there are no further questions, I will just leave it at the law says what it says, and what Mr. Fulham seeks is to say, even though I admit I did it, I want my employer to get in trouble because I got caught. If there are no questions, thank you for your time. Okay, Mr. Wade for a vote. Your Honor, the most fundamental disagreement I have with what she said is that she says this court is to, and maybe it already has. She says maybe it already has. I was wanting to distinguish the other cases, but it is not a question of law as to whether. The use of the N-word is always 100% of the time, and there can never be another circumstance when it's not a racial slur. She's saying that is a principle of law. I'm saying that is not a principle of law. That is a question of fact. I've had one of these type of cases, the best case, in which the person referred to something as being enraged, and in that context, this court said it's always offensive and quoted these other cases, but in this case, that is normally the way in which it's used. It is normally a racially derogatory term, and that's why, well, there are a couple of reasons. He says I'm silent. I won't say it myself, but I'm also 79 years old, and I know historically how it's been done. I remember how it's been done. This young man is 25 years old. He's grown up in a different culture. He's been friends with black people, and he says he was using it in a non-racial term. It's a question of fact for the jury as to whether she influenced this board, Your Honor, for racial reasons, whether she was racially biased. In addition to other reasons we can find she's racially biased, the jury can find the fact at this stage we're supposed to accept as true Mr. Pulliam's version. Under his version, it's not true that he admitted three violations. He admitted having tobacco in there, and that is a violation. Everything else he had an explanation for or denied, such as the coach, and she's the one who made the negative comments about it. A jury could find this lady was not telling the truth, Your Honor, and it's a question for them to decide. A jury could also find that her, as Mr. Bush testified, it's her comments that caused about the N word. I refer, Your Honor, to the tab five in the record exhibit, page 778. This is the way the school board interpreted what she had said. She denied claiming he used a racial slur, and they listed rule C. He's fired for using a racial slur in conversation. That's what they thought they'd see. In the conversation she had with him, it's not just what she put in her written statement. In the conversation with him, she made them believe that he used a racial slur. A jury could find he did not use a racial slur, would not use a racial slur, and it's probably the most non-racist one among the whole group. So for those reasons, Your Honor, we thank the court for this issue. Thank you. All right, Mr. Wake, your case and all of today's cases are under submission, and the court is in recess until 9 o'clock tomorrow.